**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CHADI ABDO BADI,**

      **Plaintiff,**

**-vs-**                       **Case No. 6:12-cv-1733-Orl-DAB**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

      **Defendant.**

_____

# Memorandum Opinion & Order

  The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying his claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

  The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

  For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED.**

## I.  BACKGROUND

### A.  Procedural History

  Plaintiff filed for a period of disability, DIB and SSI benefits on June 12, 2008, alleging an onset of disability on September 1, 2007, due to bipolar disorder and pain in his feet, leg, and back. R. 49, 152, 155. His application was denied initially and upon reconsideration. R. 83-96. Plaintiff

requested a hearing, which was held on April 2, 2010, before Administrative Law Judge Apolo Garcia (hereinafter referred to as "ALJ"). R. 45-78. In a decision dated May 6, 2010, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision. R. 19-37. Plaintiff timely filed a Request for Review of the ALJ's decision, which the Appeals Council denied on September 14, 2012. R. 1-6. Plaintiff filed this action for judicial review on November 16, 2012. Doc. 1.

     **B.**     **Medical History and Findings Summary**

At the time of the hearing, Plaintiff was thirty-eight years of age, and had completed the eleventh grade; he had been employed as a tile installer. R. 48, 74, 152, 155.

Plaintiff's medical history is set forth in detail in the ALJ's decision. By way of summary, Plaintiff complained of chronic schizophrenia, poor judgment, hallucinations, and bipolar disorder. R. 79, 168. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from bipolar disorder and degenerative joint disc disease, which were "severe" medically determinable impairments, but were not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 24-26. The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform sedentary work, except that Plaintiff needed to be able to change positions at will. R. 28. The ALJ also determined that Plaintiff was moderately limited in his ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest period; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and he had difficulty dealing with stress; but he was able to understand, remember, and carry out routine instructions; make routine decisions; concentrate to complete things he starts; perform routine daily tasks independently; and cope with routine activities. R. 28.

Based upon Plaintiff's RFC, the ALJ determined that he could not perform past relevant work. R. 36. Considering Plaintiff's vocational profile and RFC, and, based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as document preparer/microfilming, an addresser, and as a cutter and paster of press clippings. R. 37. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. R. 37.

Plaintiff now asserts three points of error. First, he argues that the ALJ erred by finding he had the RFC to perform sedentary work (with certain mental limitations[1]) contrary to his treating psychiatrist's opinion. Second, Plaintiff contends the ALJ erred by relying on the VE's testimony based on an inaccurate hypothetical that did not include all of Plaintiff's limitations. Third, he asserts that the ALJ erred by improperly assessing his subjective complaints and in evaluating his credibility. All issues are addressed, although not in the order presented by Plaintiff. For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED**.

## II.     STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th

---

[1] Plaintiff challenges the ALJ's decision with regard to only his mental impairments.

Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent his from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

## III.   ISSUES AND ANALYSIS

**A.   RFC and the treating physician's opinion**

Plaintiff argues that the ALJ should not have found him able to perform sedentary work with specific additional non-exertional mental limitations, when his treating psychiatrist opined he had marked limitations which would preclude work. The Commissioner argues that the ALJ's decision was based on substantial evidence.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite him impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

The ALJ determined Plaintiff had the following residual functional capacity:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant needs to change positions at will. The claimant is moderately limited in his ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest period; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. The claimant is able to understand, remember and carry out routine instructions; make routin[e] decisions; concentrate to complete things he starts;

>perform routine daily tasks independently; cope with routine activities. The claimant has difficulty dealing with stress.

R. 28. Based on the residual functional capacity that the ALJ determined, he concluded that Plaintiff was not capable of performing his past relevant work. R. 36. The ALJ then utilized the opinion of a vocational expert to determine that there was other work in the economy that Plaintiff could perform and thus, Plaintiff was not disabled. R. 37.

Prior to the alleged onset date of disability, Plaintiff had a history of mental health problems, and he had been treated for bipolar disorder. R. 248-95, 343-70. The prior history is notable for Plaintiff's consistent complaints of side effects, most notably sedation, lethargy, and inability to function, on the prescribed medications from at least 2004 to 2006. *See, e.g.,* R. 346, 348, 350, 356, 359. Plaintiff alleged an onset date of September 1, 2007.

On January 16, 2008, Plaintiff indicated that he had been taking his medications, and that his mood was stable and had a full range of affect. R. 341. Thereafter, on February 26, 2008, Plaintiff was admitted to Orlando Regional Healthcare after he "decided that because he was leading a healthy lifestyle with exercise and eating right," he did not need to take the Risperdal medication. R. 433. However, Plaintiff began experiencing problems sleeping, flight of ideas, problems with irritability, and problems arguing with his wife; the police were called and he was taken to the hospital. R. 433. Although Plaintiff had a slight flight of ideas and rapid speech during the mental status evaluation, Dr. Keisari determined that Plaintiff was capable of making his own decisions regarding treatment, so he was not Baker Acted, but was discharged to seek outpatient treatment from his regular doctor and get back on his medications. R. 434. Unfortunately, he was returned to the hospital by law enforcement under the Baker Act on February 29, 2008, for irrational, "out of control behavior," because Plaintiff had been off medication. R. 435. Plaintiff remained hospitalized for further evaluation and stabilization until March 6, 2008, once he was back on medications. R. 435-37.

One week later, on March 13, 2008, Plaintiff was admitted to Orlando Regional Healthcare again due to bipolar disorder, and his noncompliance with the medications. R. 296. The doctors at the hospital discussed with Plaintiff "the importance of compliance and the fact that he is going to go psychotic every time if he stops his medication and relapse include hospitalization and put himself and others in danger." R. 296. At the time of admission, it was noted that Plaintiff "appears to be chronically mentally ill, and with slow deterioration in his level of functioning due to noncompliance with medications." R. 299. During this hospitalization, Plaintiff was changed from Risperdal to Haldol because his mother indicated that the Risperdal was not working well. (Id.).

On April 5, 2008, Plaintiff was again admitted to the hospital because he left the hospital a couple of weeks earlier, but did not adequately comply with treatment. R. 311. On this day, Plaintiff's family called 911, and he was admitted on a Baker Act. R. 313. Plaintiff's wife indicated that he had been "spending a great deal of money, not taking his medications, acting manic and confused and purchasing numerous cars." R. 313. Plaintiff's wife also stated that he had "not only purchased cares, but rented cars and could not remember where he parked the cars, and also bought an airplane ticket to Miami for an unknown reason." R. 313. The claimant was admitted for stabilization. R. 314. At the time of discharge, on April 11, 2008, Plaintiff was no longer delusional, but was slightly hypomanic. R. 311. He was discharged with the medications Cogentin, Depakote, Trazadone, Ativan, and instructed to have an injection of Haldol Decanoate in three weeks. R. 311. Following the hospitalization, Plaintiff presented at Seminole County Mental Health on April 28, 2008 for a follow-up. R. 339. During this visit, it was noted that Plaintiff's mood was variable, and he had a full affect. R. 339. The dosage of Risperdal was increased to 4mg a day and the Depakote with be a total of 2000mg a day; and Cogentin 2mg was prescribed to be taken with the Risperdal. R. 339.

Plaintiff followed up at Seminole County Mental Health Center on May 9, 2008 noting that his mood was stable, but he was experiencing some episodic difficulties with stiffness. R. 338.

-7-

However, in spite of this potential side effect, it was determined that the dosage of Risperdal would not be lowered, due to the recent decompensations. R. 338.  On June 2, 2008, Plaintiff was seen by Seminole County Mental Health and Plaintiff's wife indicated that he had gone on a "spending spree during a recent manic episode" and "purchased three vehicles." R. 381. The nurse practitioner at the clinic indicated that this "was typical of fairly erratic behavior consistent with his diagnosis." R. 381. A blood test confirmed that the claimant's Depakote levels were within the therapeutic range, and he was instructed to continue with the Depakote at the present level, and to lower the Risperdal to 3mg and Cogentin to 1mg "in lieu of over sedation." R. 381. On July 30, 2008, Plaintiff returned to Seminole County Mental Health indicating that he had stopped taking the Cogentin secondary to "feeling strange" when he did take it. R. 379. Thus, he was started on Artane, and the Cogentin was discontinued. R. 379.

On July 1, 2008, Plaintiff saw the psychiatrist who had treated him in the hospital at Orlando Behavioral Healthcare,  Dr. Keiseri, for a second opinion. R. 479-80.  Plaintiff reported to the nurse practitioner at Seminole Community Mental Health Center (Mr. Domenech) that Dr. Keiseri had recommended not switching medications other than possibly the Artane, which was changed back to Cogentin while continuing Depakote and Risperdal. R. 453.  Dr. Keisari noted Plaintiff's history of bipolar disorder, that he had four hospitalizations from February to April, gave his current medication dosages, and that he was stable on medications, and was being followed at Seminole County Mental Health. R. 479.  He recommended that Plaintiff continue his treatment there. R. 479. Plaintiff was requesting a letter, and Dr. Keisari noted the letter was written; however, Plaintiff was to continue to follow up for treatment at Seminole County Mental Health.  R. 480.

In a letter dated July 3, 2008 to Suntrust Bank Recovery Department, Dr. Keisari, of Orlando Behavioral Healthcare, indicated that he had started treating Plaintiff while he was at South Seminole Hospital from February 2008 until April 2008. R. 558. Dr. Keisari noted that Plaintiff had four

-8-

hospitalizations during that period, and that he "was tried on a variety of medications that for one reason or another were not working well." R. 558. Dr. Keisari opined that during that period of time, Plaintiff was "acutely psychotic and deteriorated from his Bipolar Disorder." R. 558.

Plaintiff continued seeking treatment from Seminole Community Mental Health Center, and continued to have his medications prescribed throughout the end of 2008. R. 400-04. At the October 8, 2008 appointment, the nurse practitioner noted that Plaintiff did not lower the Risperdal dose as "he was aware that he would not do as well on the lower dose. . . . He did express concerns regarding side effects as periodically he'll have some spasms." R. 402. They discussed Plaintiff trying other medications, which he declined, with the nurse practitioner noting "He's been on just about everything unsuccessfully." R. 402.

On February 25, 2009, Plaintiff requested a reduction in the Risperdal dose because he was having some stiffness, possibly secondary to the Risperdal; thus, the nurse practitioner agreed to reduce the dose to 2mg. R. 411. On March 9, 2009, Plaintiff indicated that he was starting to feel unbalanced, and reported that the lower dose of Risperdal was not working for him. R. 410. Thus, the Risperdal was increased to 3mg a day. R. 410. Plaintiff requested lowering his Depakote; he was very persistent in gradually wanting to come off of the medications; blood work including Depakote level was ordered. R. 410. The nurse practitioner did not recommend any adjustment to Plaintiff's medications as he was functioning fairly well. R. 411.

On May 27, 2009, Plaintiff requested switching medications because he believed it was causing him to experience some mild stiffness to his legs; he remained resistant to the medication. R 407. The nurse practitioner offered to try to switch Plaintiff to one of the newer medications, however, when told of the side effects they could cause, Plaintiff declined. R. 407. The nurse practitioner noted that "when we have tried him on a lower does [of] Risperdal he's decompensated fairly quickly, [and] he's returned for follow-up." R. 407. June 2009, Plaintiff remained on the 3mg

dose because the primary care nurse practitioner acknowledged that Plaintiff difficulties "may not be related to the medications; Plaintiff was concerned that he might decompensate on the lower dose of Risperdal." R. 406.

On September 10, 2009, Plaintiff had a blunted affect, but his sleep and appetite were stable; he complained of "stiffness" so he was requesting that the medications be adjusted to help with this situation. R. 451. However, each time the mental health practitioner had attempted to taper the medications, Plaintiff had decompensated, becoming increasingly paranoid; Plaintiff had tried a number of other medications including Geodon, Abilify, Seroquel, so the option was to try other alternatives, Clazuril or Zyprexa. R. 451. On October 1, 2009, Plaintiff reported the Cogentin was causing urinary problems and it was stopped; he was re-prescribed Artane. R. 450. On October 29, 2009, Plaintiff indicated that Artane was causing lightheadedness, and it was discontinued. R. 445. On December 17, 2009, when Plaintiff returned to South Seminole Mental Health Center he reported that he was taking his medications, but he had been experiencing urinary problems and the urologist recommended that the dosage of the Depakote be reduced; however, the physician did not recommend this because of Plaintiff's history, and continued the medications at the same level. R. 443.

Several times in March 2010, Plaintiff presented at the emergency room on several occasions, complaining of severe headaches diagnosed as cluster headaches. R. 491-535; 516. On March 31, 2010, Dr. David Keisari, completed a Mental Impairment Questionnaire indicating that Plaintiff suffered from Bipolar Disorder with a poor prognosis based on poor concentration, low baseline, and low functioning level; he opined that Plaintiff had "marked" limitations in restrictions of activities of daily living, difficulties in maintaining social functioning, and deficiencies of concentration, persistence or pace; and one or two episodes of decompensation, *i.e.*, several hospitalizations. R. 486-88.

Dr. Keisari identified a long list of 17 signs and symptoms that Plaintiff had shown: anhedonia or pervasive loss of interest in almost all activities; decreased energy; blunt, flat or inappropriate affect; poverty of content of speech; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; *psychomotor agitation or retardation*; persistent disturbances of mood or affect; change in personality; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); motor tension; emotional liability; manic syndrome; vigilance and scanning; easy distractibility. R. 487.

Dr. Keisari also opined that Plaintiff has a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate"; he also opined that Plaintiff was not a malingerer. R. 489. After the hearing on April 20, 2010, Plaintiff continued to seek medication refills from Seminole Behavioral Healthcare, and on June 24, 2010, the treating nurse practitioner indicated, "It's doubtful that the client could maintain full time employment and be self-sufficient." R. 537.

Plaintiff argues that the ALJ erred in assessing the opinion of his treating psychiatrist, Dr. Keisari, which provided:

> Little weight is given to the opinion of Dr. Keisari who assessed marked restrictions of activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. Dr. Keisari's opinion contrasts sharply with the other evidence of record, which renders it less persuasive. A review of the entire medical record demonstrates that the claimant functions well when he is compliant with his medications. Dr. Keisari's opinion is also inconsistent with his own assessment. Dr. Keisari opined that the claimant has marked functional restrictions; contrarily, he gave a GAF score of 60, indicating only moderate symptoms. Additionally, Dr. Keisari noted he could not assess whether the claimant had low IQ or reduced intellectual functioning because no tests had been taken; however, he noted retardation as one of the claimant's symptoms. Furthermore, there is no indication in the evidence of record of a treatment relationship with the claimant and Dr. Keisari's assessment is not supported by a longitudinal review of the entire medical record. Accordingly, his opinion is accorded little weight.

-11-

R. 35.

Plaintiff contends the ALJ's discounting of Dr. Keisari's opinion – in part because he did not have any I.Q. tests results – was flawed. Plaintiff argues that Dr. Keisari did not indicate that Plaintiff was "retarded" or had "reduced intellectual functioning," but rather Dr. Keisari opined that Plaintiff suffered from *"psychomotor* agitation or retardation." R. 487. It is clear that the ALJ misunderstood the opinion of Dr. Keisari in finding that the doctor noted "retardation" as one of Plaintiff's symptoms even though he admittedly had no I.Q. test results. Dr. Keisari checked the box on a Mental Impairment Questionnaire form[2] which indicated Plaintiff had a symptom of "psychomotor agitation or retardation." R. 487.

The Commissioner argues Dr. Keisari's opinion was internally inconsistent in that he indicated Plaintiff did not have reduced intellectual functioning, but also checked the box indicating that Plaintiff had symptoms of psychomotor agitation or retardation, which the Commissioner argues, "would include symptoms related to intellectual functioning such as problems with thought."[3] Doc. 20 at 9. The Commissioner's argument is an unhelpful attempt to further the ALJ's mischaracterization, when it is clear from the medical definition of the term, that the ALJ misunderstood the meaning of the "retardation" when it is used in conjunction with "psychomotor," as applied to someone experiencing depression or bipolar disorder.

Retardation in common parlance and as the ALJ mistakenly discussed it here describes a person with an I.Q. below 70, which would naturally be determined based on an I.Q. test. STEDMAN'S

---

[2] To the extent Plaintiff argues that Dr. Keisari's handwriting is "illegible" the Court finds that it is difficult to read but not illegible, and thus readable.

[3] The Commissioner cites to the definition of Psychomotor Retardation, found on a website: http://psychcentral.com/encyclopedia/2008/psychomotorretardation/ (visited Sept. 20, 2013).

MEDICAL DICTIONARY (28th ed. 2006). However, "psychomotor[4] retardation" is not based on I.Q. at all, but is a "long established component of depression" or bipolar disorder in the depressive phase that is observable as marked speech abnormalities, such as lengthy pauses and lowered volume of speech; characteristic eye movements, such as fixed gaze and poor maintenance of eye contact; gross psychomotor slowing, including movement of the hands, legs, torso, and head, slumped posture, and increased self-touching, especially of the face.[5]

Plaintiff also argues that the ALJ erroneously found that Plaintiff had no "treatment relationship" with Dr. Keisari and his assessment was "not supported by a longitudinal review of the entire medical record." R. 35. Plaintiff argues that it appears some treatment notes are missing from the record and that Dr. Keisari treated Plaintiff "from 2008 and into 2009" (citing R. 479-80, 558). Plaintiff also argues that, if there was any doubt about it, the ALJ should have recontacted Dr. Keisari to determine the contents of his records, and whether other records existed because the "frequency and length of contact" of Dr. Keisari's treatment of Plaintiff is not clear. R. 486. Additionally, Plaintiff argues, even from these limited records, it is clear that Dr. Keisari provided treatment to Plaintiff (at the very least) on a few occasions, which is more than the non-examining, reviewing state agency physicians who never examined Plaintiff at all. Plaintiff contends the ALJ erred in giving "significant weight" to the opinion of the non-examining state agency physician over the opinion of Dr. Keisari.

The Regulations establish a "hierarchy" among medical opinions that provides a framework for determining the weight afforded each medical opinion. "Generally, the opinions of examining

---

[4]Psychomotor refers to the psychological processes associated with muscular movement and to the production of voluntary movements. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[5]"Psychomotor retardation in depression: Biological underpinnings, measurement, and treatment, Prog Neuropsychophamacol Biol Psychiatry (Mar. 30 2011), available at National Institutes of Health Library website, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3646325/.

physicians are given more weight than those of non-examining physicians, treating physicians' opinions are given more weight than non-treating physicians. *McNamee v. Soc. Sec. Admin.*, 162 F. App'x 919, 923 (11th Cir. Jan. 31, 2006) (unpublished) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5); see also 20 C.F.R. §§ 404.1527(f), 416.927(f).

Overall, the records of Plaintiff's mental health treatment indicate that he had a long history of mental health treatment in and outpatient and an inpatient setting. Plaintiff exclusively saw a nurse practitioner, Mr. Domenech, at Seminole Behavioral Healthcare, and a nurse practitioner is not an acceptable treating source under the Social Security regulations. *See* 20 C.F.R. §§ 404.1513; 416.913. Only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 CFR 404.1527(d) and 416.927(d); R. 34; Social Security Ruling (SSR) 06-03p, 2006 WL 2329939 (Aug. 9, 2006)[6]. Instead, Plaintiff requested an opinion from Dr. Keisari at Orlando Behavioral Healthcare, who had treated Plaintiff as an inpatient at when he was hospitalized four times in 2008, and again in 2009 for a second opinion, before preparing the Mental Impairment Questionnaire in March 2010. R. 486. Dr. Keisari had provided psychiatric treatment to Plaintiff such that the ALJ should have weighed his opinion as that of a treating physician. The reviewing state agency psychologists, Theodore Weber

---

[6]Under the Social Security Regulations, in addition to evidence from "acceptable medical sources," the ALJ may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function, including nurse practitioners. Such information cannot establish the existence of a medically determinable impairment and there must be evidence from an "acceptable medical source" for this purpose, but information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function. Social Security Ruling (SSR) 06-03p, 2006 WL 2329939 (Aug. 9, 2006)

and Deborah Carter, reviewed the mental health records as they existed in 2008 and 2009, and did not have the benefit of Dr. Keisari's opinion from 2010 or lengthy records from Seminole County Mental Health showing Plaintiff's continued struggles with side effects.

Plaintiff additionally argues that the ALJ's conclusion that "Dr. Keisari's opinion contrasts sharply with the other evidence of record" is erroneous. The Commissioner argues that the ALJ appropriately found Plaintiff's treatment history showed that when he was compliant with his medications "he functioned well." R. 29; Doc. 20 at 6 (citing R. 341-43, 379-81, 400-09, 411-18, 421, 443-54). However, the longitudinal picture of Plaintiff's mental health shows that it was not a simple matter of Plaintiff being noncompliant with his medications. If the ALJ finds Plaintiff "not disabled" based on noncompliance, the regulations allow denial of disability only if the claimant fails to follow prescribed treatment without a good reason. See 20 C.F.R. §416.930. Social Security Ruling 82-59 recognizes that noncompliance is only an issue when the individual meets Social Security's definition of disability, but the claimant refuses to follow prescribed treatment that is clearly expected to restore capacity to engage in substantial gainful activity. In those circumstances, the Commissioner must determine whether the noncompliance is justifiable by inquiring further of both claimant and, if necessary, the treating source.

The ALJ discounted Plaintiff's credibility (R. 32) and determined Plaintiff had "a documented history of non-compliance" and when Plaintiff was "compliant with his medications he functions well." R.32-33. The ALJ viewed the noncompliance as evidence that Plaintiff's symptoms "may not have been as limiting as Plaintiff alleged." R.33. The Court notes that Plaintiff's difficulties with side effects were documented, and problems with compliance are typical with mentally disturbed patients. Plaintiff complained consistently of side effects from the medications including sedation, lethargy, and inability to function – he did "well" or was capable of working part-time; however, he constantly asked to have the medications reduced or tapered, but when they were tapered, or he tapered them on

-15-

his own, he decompensated and was hospitalized. He had subsequent side effects treated by the urologist, who recommended lowering his Depakote dosage.

The ALJ failed to note that the same mental health practitioner who repeatedly documented Plaintiff's non-compliance also opined as late as June 2010 that Plaintiff's insight and judgment were limited and it was doubtful that Plaintiff could maintain full-time employment or be self sufficient. R. 537. To the extent the ALJ based his decision on Plaintiff's noncompliance with medication as a basis for discrediting Plaintiff's subjective allegations, the decision was not supported by substantial evidence. The ALJ also erred in not giving Dr. Keisari's opinion the appropriate weight as a treating physician, in giving more weight to the non-examining reviewing physicians, and in discounting his opinion, in part, based on a mischaracterization of the reference to "retardation" without recognizing it in the context of "psychomotor retardation."[7] Accordingly, the ALJ's decision was not based on substantial evidence and the ALJ's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion

**B.     Hypothetical to the VE**

Plaintiff argues that the ALJ erred in relying on the testimony of the Vocational Expert after posing a hypothetical question that did not adequately reflect all of his limitations because the ALJ defined "moderately limited" as "a serious impairment in these areas but the person is still able to function satisfactorily."

Plaintiff is correct that case law in this circuit requires that the ALJ employ hypothetical questions which are accurate and supportable on the record and which include all limitations or restrictions of the particular claimant. *Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985). Where the

---

[7]The Court need not reach the issue of the appropriate weight to be given to Plaintiff's GAF scores from a particular day, other than to note that the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Wind v. Barnhart*, 133 Fed. Appx. 684, 2005 WL 1317040 at *6 n.5 (11th Cir. 2005).

hypothetical employed with the vocational expert does not fully assume all of a claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence. *Id.* at 1561 (quoting *Brenam v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)).

Plaintiff argues that the ALJ erred in defining a "moderate" limitation as he did because it basically constitutes no limitation at all. He argues it is not even clear how this definition is derived, since it is not one the documents from the state agency physicians, at R. 365-78, 382-96.

For the reasons stated above, the ALJ's failure to properly credit Dr. Keisari's opinion other evidence of Plaintiff's limitations was error, and his failure to include limitations from Dr. Keisari's opinion in the hypothetical question to the VE was also error. Thus, it was error for the ALJ to rely on the VE's testimony based on an inaccurate hypothetical.

## IV.  CONCLUSION

For the reasons set forth above, the ALJ's decision is not consistent with the requirements of law and is not supported by substantial evidence. In reaching this conclusion, the Court is not conveying any indication as to whether Plaintiff should ultimately be found entitled to benefits, only that his claim must evaluated in accord with the established standards.

Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 6, 2014.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record